Good afternoon, Your Honor. May it please the Court, my name is Adam Gassner. I represented Defendant Lenny Moya at trial and Appellant Lenny Moya before this Court. I would like to take just several minutes, three minutes, on behalf of Mr. Moya and apportion the balance of that time to the attorney for the co-defendant, Mr. Sibeli, who I think will also reserve five minutes for rebuttal. Your Honor, on behalf of Mr. Moya, I would like to note that the jury in this case found Mr. Moya and Mr. Mondragon not guilty of the conspiracy but independently guilty of the narcotics trafficking, implicitly indicating there are two separate not finding that there was a conspiracy, not finding there was a joint decision between the two of them to transport these narcotics, this methamphetamine, from Mexico through Marin County, where they were apprehended based on speeding. And at trial it became evident that there was one bag of methamphetamine in the backseat of the vehicle and that Mr. Moya had stated he did not have actual knowledge of that methamphetamine. So here we are with one trial, two separate individuals with very antagonistic defenses. It's very clear. And at trial, were there not co-defendants, I would not have been proscribed by the court from stating and articulating that, for example, my client subjected himself to cross-examination. He took the stand. He decided to testify. He looked you in the eye. I was proscribed by the district court in my argument on this very important issue because I was at joint trial. I thought that you were allowed to make any argument you wanted regarding the fact that he did testify as long as there was no comparison. It was — it was — I was limited by the court in a way that I think infringed on Mr. Moya's Sixth Amendment right because of the sacred right of Mr. Mondragon's Fifth Amendment right. I don't — I don't dispute that. And in what way were you limited? I was proscribed because I was not allowed by the — by the district court to comment that Mr. Moya took the stand, he subjected himself to cross-examination, or he decided to testify. Judge Cabrera specifically said that those types of statements would infringe on Mr. Mondragon's Fifth Amendment right. There were statements I was able to make, but those statements I was proscribed for making. And it was difficult because I'm the only one. I know it may seem simple to us, but not necessarily to a lay jury. I needed to make those arguments to draw that distinction. And so I'm — before the court to say — Well, what did you say? I was able to say that Mr. Mondragon — that Mr. Moya explained himself. That I think I may have misspoken a moment ago, that he — that he was able to look you in the eye. Right. So you basically were able to say what you wanted to say. What you weren't able to say was, unlike Mr. Mondragon. That is correct. And I believe that this — But of course, if you had tried separately, Mr. Mondragon wouldn't have been there not testifying because he wouldn't have been there. So you wouldn't have been able to say it anyway. I would have certainly been able to highlight that he wasn't there. I would have been able to point the finger at him. But he wasn't there because he wasn't a defendant. I would have — he was certainly factually part of the case. And if he was — In other words, his not testifying in a trial that wasn't with him wouldn't have any salience at all. I understand the Court's point. And given what I had stated a moment ago, I will cede the balance of my time to — Okay. Thank you. Mr. Cebelli. Good morning, Your Honors, and may it please the Court. My name is Martin Cebelli. I represented Mr. Mondragon below. And together with Jennifer Nagel, I represent him in this Court. Your Honors, I want to focus on the confrontation issue from my client. And I'd like to begin by posing a hypothetical. I'd like to imagine that two young men participate or tried for two drug runs, just like the drug run at issue in this case, on two different dates. They're separate events. They're tried jointly. Two young men. Imagine that both of them face a 10-year mandatory minimum on each of the drug runs. And imagine that one of the defendants, defendant number one, testifies at trial that he was fully participating as a guilty person in one of the drug runs, just as the government alleges, but that he knew nothing about the second drug run, and that that was all the fault of defendant number two. In that situation, defendant number one is testifying 100 percent consistent with the government on the second drug run. In that case, it would be obvious that because defendant number one supports the government's theory, we should be able to confront him with the fact that he's facing a mandatory minimum, not just on one, but on both of the substantive counts. And that's what happened here, taking away one of the drug runs. In other words, just as in Larson, we have a situation in which one of the defendants is giving information, contributing to the theory of the government, in a way that fleshes out the government's case. Now, the government didn't call for it. But the question is, what are you allowed to confront him with his obvious motive to lie, or motive to lie, what do you have to be able to say about that? Well, where the trial, is his motive to lie pretty obvious? In other words, when you have an informer testifying who isn't himself on trial, there, without very specific information, the jury really can't judge why this guy would be doing it. But when he's actually on trial himself, there's, unless I'm very naive, it seems to me that the motive to lie is pretty obvious. I don't think so, Your Honor. In the abstract it is, and perhaps I'm talking from the trenches here, as a trial lawyer, juries of course know that a defendant has a motive to lie to avoid a conviction. But is that motive to avoid a six-month sentence, a five-year sentence, or a 20-year sentence? And one of the things that district courts constantly do, because it's the law and they have to do it, is to remind juries, punishment is my duty, it's not your duty. You don't worry about it. And so a jury is not only unaware of the 10-year mandatory minimum, but it is also told not to think in those terms at all. It seems to me that there was confrontation. Look, the trial judge was faced with a bit of a dilemma. He had to really navigate between Fifth Amendment rights and Sixth Amendment rights, with co-defendants being prosecuted in one trial. And it seemed like he really did a pretty good job, to me. And there was confrontation. Your claim is that he should have been allowed to say 10 years, and that's your whole case? Yes, Your Honor. I agree that there was confrontation. The question is, was there enough confrontation? And there is no... That's true, but the jury convicted him after deliberations that lasted longer than the taking of evidence, splitting a verdict, and sending out five notes. This was a very, very, very close call for Mr. Mondragon. And there is no principled difference between the rule enunciated in Larson and the situation here. The only real difference is that in Larson, it's somebody called by the government, and in this case, it's somebody who calls himself. But that distinction actually cuts in our favor, because if the jury had believed Moya about Mondragon, about himself and Mondragon, then Mr. Moya, the co-defendant, would have walked away clean, with not a day in jail. Whereas a cooperator in the Larson scenario gets some sort of reduction. So imagine this is a cooperator scenario. That person has the incentive to lie, to get down from a 10-year mandatory minimum, to maybe something like 8, 7, 6, 5. In this case, if Moya is believed, his incentive is even greater. But the rule that the district court enunciated here, and I think Judge Chhabria is a terrific judge and I enjoy trying cases in his courtroom, but I think he got this one wrong, because the jury actually needed to know more in this scenario. What more do they need to know? It seems to me that the jury had ample evidence to be able to assess his credibility, and that the judge didn't allow questions to be posed to him. Maybe not the exact 10-year standard that you want to employ, but he came pretty much close to that line by letting the jury know that he was a bad egg. Sure, and if you look at Larson, the principal witness there, Lemire, was a bad egg. And the evidence that was let in, allowed to be crossed upon against Lemire, was a lot worse than here. Seven felonies, lying on the witness stand during the trial, selling more drugs and a number of very, very extreme impeachment type evidence, which Mr. Moyer didn't have, but Mr. Lemire did have in Larson, and still the Larson court held, because of the mandatory nature of the penalty, that the jury should have known about it. And that's exactly what I'm saying here. I think that's the same case that we have here, though. There's no mandatory, you know, minimum that the jury was entitled to know about. I don't see where you, where that flows. Larson has a mandatory minimum, and so does our case. And what Larson held was, because of the mandatory nature of the sentence that Lemire was facing, Larson should have been able to confront Lemire with that mandatory minimum. That's exactly what I'm saying here. There is no difference. I have to check that out. I don't see where that's really relevant here, but we'll check it out. Yes, Your Honor, please do, because the issue in Larson was whether or not there was an unconstitutional restriction on the scope of cross because there was a mandatory minimum that Lemire was facing. And in that case, the district court had not allowed cross on the mandatory minimum, but lots of other cross. And the court of appeals held that's not enough. You're saying it's a matter of law that it was wrong for the district court judge not to allow questions about the fact that he was facing a 10-year sentence. Yes, I'm saying it's an abuse of discretion. That's the standard. And that the exact same situation was looked at in Larson, the only difference being— Well— I'm sorry, Your Honor. In Larson, I mean, the countervailing reason for this is the general reluctance to let the jury decide as to the people who are in trial based on what their sentence is going to be. Now, in Larson, because I don't know the facts well enough, was there any carryover from the sentence that was to which the cooperator was going to be subject to the defendant? Why? I believe so, Your Honor, because they were charged in the same conspiracy. And that's where the Beardsley factors come in. And one of the factors, the second factor, is whether or not there's any way to deal with this. And this is dealt with day in, day out across the country in district courts, as Your Honor knows, with a curative instruction saying, don't look at that. That's done day in, day out in every single case where this happens with a cooperator, with a government cooperator. It could have—the same instruction could have been done here. I mean, it seems that the district court should have some discretion. I would agree with you if he didn't allow any questioning at all to attack his, you know, credibility or to deal with the issue of punishment. But the district court judge was faced with the sticky wicked. He tried to balance these respective rights out. That's what we do all the time. Yes. And I think Judge Trobriere struggled with this thing. He called it a close call. But he didn't let me cross on prison time. He let me cross on a serious federal drug crime. And that is not enough. It's not enough under Larson. And it's not enough for a jury in terms of common sense. I do lots of work with NACDL, and I've looked at a lot of convictions, and I've looked at lots of—I've talked to jurors, and they don't know. They have no idea in these cases. They think the judge is going to do the right thing. Does it make any difference that the jury obviously did not believe him anyway? I think they may have believed him. It's perfectly possible they believed Moya because he filled in a piece of the government's theory that they didn't have, and that's how the drugs got in. And they could—and that's why they rejected the conspiracy charge. They rejected the conspiracy charge because they said, okay, we believe Moya that he didn't know before they got to Los Angeles. But once they got to Los Angeles, he became an aider and abetter. That's totally consistent with the jury's verdict. We cannot say beyond a It's very mysterious why they didn't convict him of conspiracy, but it didn't convict your client of conspiracy either. Because there was no conspiracy, because they— Oh, because it was the other guy. Because they believed Moya. But still, I mean, if you get to Los Angeles and he knows there's meth in the car and he's driving it, it's still a conspiracy. I mean, it doesn't make a whole lot of sense no matter what you do with it. It's not a conspiracy because there was no agreement. If what the Court is saying is correct, then there was a compromise verdict, which means that more jurors were struggling with not convicting at all, which underlines how close a case this was, how close a call this was for the jury. And my time is up, Your Honor. I wish that I could thank you. It is. Thank you very much. Good morning, Your Honors. Jonas Lerman for the United States. I'll start briefly with the severance issue. The defendants have cited no case where this Court has required severance on comparable facts. I want to underscore that this was a conspiracy. This Court said just last year in Berrigan that a joint trial is particularly appropriate if co-defendants are charged with conspiracy. I'm sorry, Your Honor. I haven't heard your adversaries argue about severance. I believe Mr. Moyer's counsel began by talking about severance, but of course, that's a claim he waived because he didn't raise it during trial. He didn't preserve it. So I'll move to the other issues. I think they are intertwined because the 10-year mandatory minimum issue and the closing argument about Mondragon's silence, that's the claimant's prejudice that the defendants say that severance would have secured. So beginning with the 10-year mandatory minimum, Mr. Mondragon's counsel absolutely still got to cross Moyer thoroughly about his motivations to lie, including not just his desire to avoid a serious Federal conviction, but also a serious Federal conviction that could ruin his life and take him away from his 1-year-old baby, and that's at ER 434 to 435. And when I give ER sites, those are going to be to Mondragon's excerpt. Why should you not have been allowed to question him about the 10-year mandatory minimum? The adversary says it's not all the time. It is never done in cases where the witness is not a cooperator testifying for the government in the hope of a government benefit. And he conceded that. He has conceded that he has found no authority from any court where any defendant testifying solely on his own behalf, where any court of appeals has ever said that the confrontation right allows a co-defendant's counsel to question him about the mandatory minimum. His leading case is Larson. And I think it's worth taking a moment on Larson, because Mr. Sibeli is a friend of mine, but I think he has misrepresented the holding of Larson to this Court. On page 19 of his opening brief, he says that this Court reversed in Larson. That's not true. This Court affirmed in Larson. Larson's holding is limited in a couple of respects that don't apply here. So there were two cooperating witnesses in Larson. One was facing a 5-year mandatory minimum. The other was facing a life mandatory minimum. The district court did not allow cross-examination about either of those mandatory minimums. As to the first cooperator, the one facing a 5-year mandatory minimum, this Court found that there was no confrontation clause violation. There was no abuse of discretion by the district court, because the jury still had enough information to evaluate that cooperator's credibility. Now, as to the other cooperating witness testifying for the government, that cooperator was facing a life mandatory minimum sentence, and this Court made clear that a life mandatory minimum sentence is different. That cooperator had an overwhelming desire to testify to the government's satisfaction, to support the government's case, and that that put that cooperator in a different category. But even there, this Court found that the error was harmless beyond a reasonable doubt. So this Court affirmed the district court there. And I know that Judge Gould was on that panel, and he voted with the majority in Larson. So there's nothing in Larson that supports the Mr. Mondragon's Mr. Mondragon's theory here. Mr. Moyer was not a government cooperator. He testified adverse to the government, and the idea that his testimony was somehow helpful to the government or that we needed him to convict Mr. Mondragon is just not borne out by the record. Recall that Mr. Mondragon is the defendant who ran during the traffic stop. While the officers were conducting the search of the car, Mr. Mondragon and Mr. Moyer were looking back and forth at each other nervously, and Mr. Mondragon, he kept getting into a crouch position. He was sitting on the curb, and he kept getting into a crouch. And the officer had to keep reminding him, I think, three times to sit back down on the curb. And then when the officer took the bag, the target bag full of methamphetamine, out of the car and showed it to the other officer, Mondragon takes off running down the street, and he sneaks through a hole in a roadside fence and escapes. It doesn't end there, the evidence against Mr. Mondragon. Recall also his jail calls. So his theory is, I had no idea there were drugs in the car. Mr. Moyer brought the drugs into the car without my knowledge, right? Look at his first two jail calls. They are to Mr. Moyer's cousin Daniel. He asks Mr. Moyer's cousin Daniel for Daniel's help in creating a phony title transfer to hide the ownership of the Mercedes. He asks Mr. Moyer's cousin Daniel for help getting Mr. Mondragon and Mr. Moyer out on bail. So this is not the behavior of someone whose friend supposedly just brought two and a half kilos of methamphetamine into a car without his knowledge. There was ample independent evidence against Mr. Mondragon that had nothing whatsoever to do with Mr. Moyer's testimony. And the jury recognized Mr. Moyer as a liar. That's why they convicted him. And the district court found that Mr. Moyer's motive to lie is obvious, that it wasn't concealed from the jury. That's at ER 260. The district court found that Mr. Mondragon's counsel had the opportunity to fully convey to the jury Mr. Moyer's incentive to lie, and that's at ER 655. But of course, the problem was that the jury also disbelieved Mr. Mondragon's defense. But again, that's not surprising, because there was ample independent evidence of Mr. Mondragon's guilt. So the bedrock rule is the juries are not to consider punishment. This Court said, for example, in Frank, it has long been the law that it's inappropriate for a jury to consider or be informed of the consequences of the verdict. And in Shannon, the Supreme Court said that telling the jury about that creates a strong possibility of confusion. So the district court was well within its discretion to allow the questioning about wanting to avoid a serious Federal conviction that would ruin Mr. Moyer's life, but precluding Mr. Mondragon's counsel from questioning him about the specific mandatory minimum that both defendants faced. On the Mr. Moyer's issue about — so I take it his theory is that in a joint trial, if one defendant testifies, the testifying defendant's attorney has a right to commit a Griffin error. And that's not true in this case. And that otherwise, severance is required. What exactly was he allowed to say? So the district court ruled that Moyer's counsel, quote, and this is at ER 272, can obviously focus heavily on his client's testimony and what he said on the stand and his demeanor and whatnot, but I don't see any reason why counsel should be allowed to — in my notes, I have an ellipsis — but make arguments about his client's choice to testify and the significance of his choice to testify. So that's ER 272. There's some more discussion, and then at ER 275, he's addressing Mr. Moyer's counsel. So you can say that he answered their questions, looked the government in the eye, faced down the government, whatever, and then the court continued. But to the extent that you are saying he subjected himself to cross-examination by the government, you're making reference to his choice. In this context, that would be inappropriate. And I can read you what Mr. Moyer's counsel said to the — to the jury in his closing argument. He gave an extensive argument where he highlighted Mr. Moyer's testimony. He said Lenny was innocent, and he testified that he didn't know there were drugs in the car. He took the witness stand under oath and told you that. That's the evidence in this case. You're to treat that evidence like you would treat any other piece of evidence. You've heard that instruction. That's evidence. The only person that came on this witness stand to tell you whether he did or did not possess it was Lenny Moyer himself. Nobody else said that he did, but he said that he didn't. That's the actual evidence in this case. And that's at ER 536. So he absolutely got the chance to highlight his client's testimony to the jury, and he was not prescribed in the way that counsel suggested today. We did not talk about Mr. Mondragon's claim about a Griffin error. I can address that if the Court has questions about it, but otherwise, I will — Sotomayor Actually, from what you just read. It is. It's sort of the converse of Mr. Moyer's claim that Mr. Moyer says, I didn't get enough — I didn't get to say enough about Mr. Mondragon's silence, and Mr. Mondragon's claim is he said too much. But the — I just — I do want to stress that those lines from Mr. Moyer's counsel's closing argument need to be read in context, and they were about the weakness, the supposed weakness of the government's case, that there was no DNA evidence, no fingerprints, and so forth. But the argument was not manifestly intended to comment on Mr. Mondragon's silence, and that's this Court's standard. There was no direct comment on Mr. Mondragon's not testifying, and that's — that language is from Moreno and Nunez. And I think it's helpful to look at the types of closing arguments that this Court has found did not cross the line in Griffin. Ginsburg Is there a case law holding that a co-defendant can commit Griffin error, as opposed to the government? Yes. In Moreno and Nunez, this Court said that comment on a defendant's failure to testify, whether by the prosecutor, the court, or a co-defendant, is improper. In Moreno and Nunez, the comment from defense counsel was that his client, quote, had the guts to take the stand and withstand cross-examination, and then he went on from there. This Court held that that comment didn't cross the line and didn't require reversal. It wasn't a direct comment on silence. In Olano, this Court considered an argument from a defense counsel who said that his client, quote, sat up in that chair for almost 20 hours and let everybody take a shot at him. And this Court said that didn't cross the line because it implicated the co-defendant's silence only indirectly. And then maybe the most extreme example is in Patterson, where the defense attorney said that his client, quote, is different than the other defendants in this case. He's different for one reason among many, but the reason is that he has the guts to take the stand and withstand cross-examination. And this Court held that that comment was improper, but that it wasn't reversible error. But even if there was a Griffin error here, it was cured by the unchallenged jury instructions. And that applies to all the claims here, actually, that as to severance, as to everything, the district court gave careful and repeated and unchallenged jury instructions about, you know, a defendant not having any obligation to take the stand, about the jury's obligation to consider the evidence against each defendant separately, and so on. Mr. Mondragon did not object. So Mr. Mondragon objected to this comment by Mr. Moya's counsel in closing argument, and they had a sidebar. But Mr. Mondragon did not ask for any additional curative instruction there. He didn't argue that the instructions given by the Court were inadequate. And so the district court did not plainly err by giving additional curative instructions that no party asked for, unless the Court has other questions, we'd ask you to affirm the defendant's convictions. Thank you. We're seeing three seconds. We'll hear a minute and three seconds. Thank you very much, Your Honor. I would ask the Court to look at Vargas. Vargas is a case cited in our brief, and it lays out exactly why there is error here, why the government cannot show that if there was a constitutional violation, that it was not harmless beyond a reasonable doubt. And in that case, it was a cooperator case, not a co-defendant case. In the Vargas case, a man named Ramirez testified. Ramirez, the government could have proved their case without Ramirez, but that wasn't the analogous of the circuit in this case. The circuit court said, look, we're not looking to see whether or not there could have been a conviction. We're going witness by witness, and we're looking to see whether or not Ramirez's testimony contributed to the government's theory, to the government's evidence. And it did. And that's the Vargas case. And what I'm saying about that applies to this case, because here the government had no theory as to how the package got in the car. And that's what Moya gave them. And it very well is possible that that jury could have believed Moya about how the package got in the car, and that's why they split the verdict. They said, they're not conspirators, there's no agreement, but Moya aided and abetted once he knew that the package was in the car. Thank you very much for the extra time, Your Honor. Thank you. The case of Moya and United States v. Madraca and Moya is submitted and we are in recess. Thank you.
judges: Gould, Berzon, Block